NOT FOR PUBLICATION

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

_____
                                                                  :
ROBERT F. GARRICK,                           :
                                                                  :
                    Plaintiff,                        :
                                                                  :         Civ. Action No. 05-3573 (JAG)
                         v.                             :
                                                                  :              **OPINION**
COMMISSIONER OF SOCIAL            :
SECURITY,                                            :
                                                                  :
                    Defendant.                      :
_____:


**GREENAWAY, JR., U.S.D.J.**

### I.  INTRODUCTION

Plaintiff Robert F. Garrick seeks review of the Commissioner of Social Security's ("Commissioner") denial of his application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") benefits, pursuant to 42 U.S.C. §§ 1383(c)(3), and 405(g).[1]  Plaintiff argues that the Commissioner's decision is not supported by substantial evidence and should be reversed.  For the reasons set forth in this Opinion, this Court finds that the Commissioner's decision is supported by substantial evidence and should be affirmed.

---

[1] These sections of the Social Security Act ("Act") provide that any individual may obtain a review of any final decision of the Secretary of Health and Human Services ("Secretary") made subsequent to a hearing to which he or she was a party.  Under 42 U.S.C. § 405(g), the federal district court for the district in which the plaintiff resides is the appropriate place to bring such an action.

## II. **PROCEDURAL HISTORY**

On December 27, 2001, Plaintiff filed an application for DIB and all other insurance benefits for which he claimed he was eligible under Sections 216(i), 223, and 1614(a)(3)(A) of the Social Security Act ("Act"), codified as 42 U.S.C. §§ 416(i), 423, and 1382c(a)(3)(A), respectively.  (Tr. 83.)[2]  Plaintiff bases his claim on pain caused by a bulging disk and rheumatoid arthritis, as independent impairments, or in the alternative, in the aggregate with other impairments including depression, lack of concentration, anxiety, suicidal ideations, and insomnia.  (Pl.'s Mem. of L. at 2, 20-21.)  After the Social Security Administration ("SSA") denied Plaintiff's application on February 28, 2002, Plaintiff filed a request for reconsideration on March 20, 2002 (Tr. 65), and the denial was affirmed on June 6, 2002.  (Tr. 67.)  Plaintiff subsequently requested an administrative hearing on June 14, 2002.  (Tr. 70.)  On April 22, 2003, Plaintiff appeared before Administrative Law Judge Ralph J. Muehlig ("ALJ").  (Tr. 22.)  The ALJ held that Plaintiff was not entitled to DIB and ineligible for SSI benefits under Sections 216(i), 223, 1602, and 1614(a)(3)(A) of the Act.  (Tr. 21.)  The ALJ found:

    1.    The claimant meets the nondisability requirements for a period of disability and Disability Insurance Benefits set forth in Section 216(I) of the Social Security Act and is insured for benefits through the date of this decision.

    2.    The claimant has not engaged in substantial gainful activity since the alleged onset of disability.

    3.    The claimant's back problem is a severe impairment, based upon the requirements in the Regulations (20 C.F.R. §§ 404.1521 and 416.921).

---

[2] The Act instructs the Secretary to file, as part of her answer, a certified copy of the transcript of the record, including any evidence used to formulate her conclusion or decision.  42 U.S.C. § 405(g).  "Tr." refers to such transcript.

4.   This medically determinable impairment does not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.

5.   I find the claimant's allegations regarding his limitations are not totally credible for the reasons set forth in the body of the decision.

6.   I have carefully considered all of the medical opinions in the record regarding the severity of the claimant's impairment (20 C.F.R. §§ 404.1527 and 416.927).

7.   The claimant has the following residual functional capacity: lifting and carrying objects weighing up to 50 pounds; frequently lifting and carrying objects weighing upon to 25 pounds; standing, walking, and sitting up to six hours in an eight-hour day; pushing and pulling arm and leg controls; and the full range of medium work.  The claimant has not had any significant non-exertional limitations.

8.   The claimant's past relevant work at security and construction did not require the performance of work-related activities precluded by his residual functional capacity (20 C.F.R. §§ 404.1565 and 416.965).

9.   The claimant's medically determinable back problem does not prevent the claimant from performing his past relevant work.

10.  The claimant was not under a "disability" as defined in the Social Security Act, at any time through the date of the decision (20 C.F.R. §§ 404.1520(e) and 416.920(e)).

(Tr. 20-21.)  On June 17, 2005, Appeals Officer David E. Clark denied Plaintiff's appeal of the

ALJ's decision.  (Tr. 9.)  Plaintiff then filed the instant action, seeking reversal of the

Commissioner's decision, pursuant to 42 U.S.C. §§ 1383(c)(3) and 405(g).

### III.  STATEMENT OF THE FACTS

**A.   Background**

Plaintiff was born in the United States on October 6, 1946, has completed school up to

12th grade, and has attended vocational school for training as a computer technician.  (Tr. 103,

252.)  Prior to 2001, Plaintiff worked as a private investigator, a marketing representative, an

3

associate sales manager, a maintenance worker, a corrections officer, and a construction worker. (Tr. 18, 109-115.)  In 2001, Plaintiff worked as a concierge for Applied Security, receiving and moving 10 pound packages from delivery companies.  (Tr. 110.)  Plaintiff stopped working on March 1, 2001, when he was laid off, and became unable to work due to disability on October 1, 2001.  (Tr. 97.)

Plaintiff contends that he can stand only for half-an-hour to an hour and sit for half-an-hour.  (Tr. 28-29.)  He allegedly can walk only two to three blocks.  (Tr. 34.)  In a daily activities questionnaire, however, Plaintiff stated that he walks or takes public transportation to attend Alcoholic Anonymous meetings, does light chores such as cooking simple meals, and enjoying music, television, and crossword puzzles.  (Tr. 117-118.)

**B.**    **Claimed Disabilities**

As this Court has noted, Plaintiff stopped working in March 2001, allegedly because of pain caused by a bulging disc in his lower back and rheumatoid arthritis in his legs and arms. (Tr. 97, 107.)  He testified that he had experienced arthritis pain for the past 30 years, but that the pain had increased to a point where he experiences aching pain 24 hours each day.  (Tr. 26, 107.) Plaintiff's pain is allegedly so severe that he cannot stand or sit for a prolonged length of time without pain.  (Tr. 107.)  Plaintiff testified that the weather causes his arthritis to get dramatically worse.  (Id.)  He also declared that due to his bulging disc, his right leg is half an inch shorter than his left leg.  (Id.)  The record also indicates that Plaintiff suffers from anxiety and depression.  (Tr. 163, 179.)

**C.**    **Medical Evidence Considered by the ALJ**

The record indicates that several physicians have evaluated Plaintiff.

4

**1**. _____*St. Mary Hospital*

Plaintiff was treated at St. Mary Hospital from November 1995 through March 2002.  (Tr. 132-182.)

On November 9, 1995, Dr. Amiri examined an x-ray of Plaintiff's ankle and noted that it showed (1) post-traumatic change with new bone formation at the distal fibula and tibia from a previous injury, and (2) secondary osteoarthrotic change with increased bony sclerosis and irregular bone contour, with Plaintiff's joint space slightly narrowed.  (Tr. 178.)

On April 16, 1996, Dr. Bhattachan examined Plaintiff and concluded that he experienced anxiety attacks, anger spells, and depression.  (Tr. 163.)  The doctor noted that Plaintiff had been seen by a psychiatrist previously.  (Id.)

On June 10, 1996, Dr. Wasserman examined an x-ray of Plaintiff's left knee, which he stated revealed no presence of any osseous pathology.  (Tr. 177.)  Dr. Wasserman noted that the "visualized portions of the bones, joints, and soft tissues examined failed to demonstrate the presence of any recent fracture, dislocation, or other significant abnormality."  (Id.)

During a November 14, 1996 visit, Dr. Tracey stated that Plaintiff had considered suicide due to his pain, although Plaintiff denied a plan to commit suicide.  (Tr. 155.)

Dr. Mignola examined Plaintiff on December 6, 1996, and found that he had a pelvic tilt to the right side and a positive straight leg raise at 35 degrees in his left leg and 40 degrees in his right leg.  (Tr. 154.)  On January 3, 1997, Dr. Mignola determined that Plaintiff had chronic pain due to the shortening of his right leg, which caused changes in his pelvis and lumbar spine.  (Tr. 153.)  Dr. Mignola also noted that Plaintiff had a positive straight leg raise test in his left leg at about 10 to 20 degrees.  (Id.)

On December 6, 1996, Dr. Sharma examined an x-ray of Plaintiff's lumbar spine and determined that it was an unremarkable lumbosacral spine study with pancreatic calcifications and post-operative changes, such as sutures and surgical clips.  (Tr. 174.)  Plaintiff's vertebral heights and spaces were well aligned and maintained.  (Id.)  There were no compression fractures, lytic, or blastic lesions, and his pedicles and lamina were intact.  (Id.)  Dr. Sharma noted that Plaintiff did not have spondylolysis or spondylolisthesis.  (Id.)

Dr. Mousavi's examination of an x-ray of Plaintiff's right tibia and fibula on January 6, 1997 showed "solitary exostosis versus osteochondroma involving distal and lateral diaphyseal aspect of the right fibula."  (Tr. 173.)  On the same date, Dr. Mousavi also considered an x-ray of Plaintiff's pelvis, which indicated osteochondroma projecting to the inferior cortical aspect of Plaintiff's left pubic bone, as well as post-surgical changes in the left lower quadrant.  (Tr. 172.)  There were no other destructive bone lesions, and no fracture or periosteal reaction.  (Id.)  Dr. Mousavi's January 6, 1997 x-ray examination of Plaintiff's hip indicated an old healed mid-diaphyseal fracture deformity of the right femur.  (Tr. 171.)  Dr. Mousavi noted that an x-ray of Plaintiff's right knee from the same date indicated no fracture, dislocation, or any other abnormality.  (Tr. 170.)  An examination of a computed tomography ("CT") of Plaintiff's lumbar spine from January 7, 1997 revealed evidence of a mild disc herniation of the L5-S1 disc space. (Tr. 169.)

Dr. Garcia saw Plaintiff on March 6, 1997, and noted that Plaintiff had a hip flexion of 90 degrees and a positive straight leg raise at 45 degrees.  (Tr. 150.)

On November 10, 1999, Dr. Murphy diagnosed Plaintiff with arthritis in multiple sites and peripheral vascular disease.  (Tr. 149.)

Dr. Jacobs examined Plaintiff from February 29, 2000, to October 26, 2001.  (Tr. 135, 137-140, 141-145.)  Dr. Jacobs concluded that Plaintiff suffered from chronic pain syndrome due to a fracture in his right leg.  (Tr. 145.)  She also noted that Plaintiff suffered from insomnia and depression.  (Tr. 142, 145.)

Dr. Bahramipour examined x-rays of Plaintiff's bilateral knees on December 13, 2001. (Tr. 167.)  Dr. Bahramipour stated that Plaintiff's tibial plateau was intact, his soft tissue gross was within normal limits, and that there was no fracture or dislocation.  (Id.)

On January 9, 2002, Dr. Butkiewicz, a physician at the St. Mary Hospital Center for Family Health, filed a general medical report, which summarized Plaintiff's medical record at the Center for Family Health.  (Tr. 204.)  In her report, Dr. Butkiewicz noted that Plaintiff's hip flexion was 60 degrees, his extension was 30 degrees, and his lateral flexion was 30 degrees in his right leg and 30 degrees in his left leg.  (Tr. 207.)  The report also stated that Plaintiff had chronic pain syndrome; fractures to the pelvis, tibia, and fibula, which resulted in osteoarthritis in the lumbar spine; fused SI joint; leg length discrepancy; and osteoarthritis in his right ankle.  (Tr. 204.)

Dr. Butkiewicz also noted that Plaintiff had a history of mild disc herniation.  (Id.)  Dr. Butkiewicz stated that Plaintiff had a significantly decreased range of motion in multiple joints, particularly in his hips and ankles.  (Id.)  She also indicated that his right leg was 1.5 centimeters shorter than his left.  (Id.)  Dr. Butkiewicz noted a negative straight leg raise test, normal grip strength, 4/5 muscle strength, and some sensory loss in Plaintiff's right lower extremity.  (Tr. 206-207.)

Dr. Butkiewicz recommended that Plaintiff take OxyContin, Neurontin, and Trazodone, and noted that Plaintiff previously had poor responses to acupuncture.  (Tr. 205.)

### 2. *Pain Management Center at Holy Name Hospital*

Beginning on July 19, 2000, and extending through June 2001, Plaintiff went to the Pain Management Center at Holy Name Hospital in Teaneck, New Jersey ("Holy Name").  (Tr. 185-198.)  Plaintiff was referred to Holy Name by Dr. Jacobs of St. Mary Hospital.  (Tr. 198.)

At Holy Name on August 5, 2000, Plaintiff was treated by Dr. Rojas (Tr. 200.)  Dr. Rojas diagnosed Plaintiff's pain as likely caused by arthritic changes in his previously traumatized right leg, hip, and pelvis.  (Tr. 200.)  Dr. Rojas noted that due to Plaintiff's past history as an alcoholic, he wished to avoid narcotic treatment, and instead prescribed Ultram for Plaintiff's pain.  (Id.)

On August 11, 2000, Plaintiff was seen by Dr. Rojas for a followup visit.  (Tr. 196.)  Dr. Rojas performed the Galen nerve test, which was positive, and demonstrated that Plaintiff had "a combination of a myofascial component to his pain as well as sacroiliac joint disease."  (Id.)  Dr. Rojas also noted that Plaintiff may also have had spinal stenosis with occasional radicular discomfort toward the right lower extremity.  (Id.)  Plaintiff was given a trigger point injection of bupivacaine and triamcinolone, as well as an additional prescription of Ultram for his pain. (Tr. 197.)

On September 13, 2000, Plaintiff returned to Dr. Rojas for a followup visit.  (Tr. 194.)  Plaintiff complained of severe pain in the pelvic region, which was confirmed with a positive Galen test.  (Id.)  Dr. Rojas performed a trigger point injection toward the sacroiliac joint.  (Id.)  Plaintiff also underwent an MRI on August 25, 2000, which Dr. Rojas stated revealed a small left foraminal herniation at the level of L3-4, a bulging disc at the level of L4-5 and L5-S1, and a

small amount of fluid, which was related to the sacroliac joint.  (Id.)  Dr. Rojas recommended

that Plaintiff receive a lumbar epidural steroid injection.  (Id.)

Plaintiff continued to complain of pain and was given a lumbar epidural steroid injection

by Dr. Nestampower on November 21, 2000.  (Tr. 193.)  Dr. Nestampower noted that there were

no complications from the procedure and that the patient tolerated the procedure well.  (Id.)

On January 5, 2001, Dr. Nestampower found that Plaintiff reported no significant

improvement after the injection, and that Plaintiff experienced increased pain with the extension

of the lumbar spine.  (Tr. 191.)  Dr. Nestampower increased Plaintiff's dosage of OxyContin to

20 mg, and prescribed Neurontin.  (Id.)

On the same day, during a followup for the lumbar epidural steroid injection, Dr. Koniuta

examined Plaintiff, and noted that Plaintiff experienced localized tenderness overlying the L5-S1

facet joints bilaterally in the lower lumbar area.  (Tr. 191.)  Plaintiff's first lumbar epidural

steroid injection resulted in the relief of 60% of his pain, but the second injection did not result in

any pain relief.  (Tr. 192.)  Dr. Koniuta noted that in addition to Plaintiff's pain in his lower back,

he was also experiencing pain in his calves, which caused Plaintiff to have difficulty sleeping.

(Id.)  The doctor stated that upon examination, Plaintiff had simple movement of his back, a

negative straight leg raise, no motor weakness in his lower extremity, and easy movement in his

hips and knee joints.  (Id.)

On February 6, 2001, Dr. Nestampower performed a bilateral lumbar facet joint injection,

which was tolerated well by Plaintiff.  (Tr. 189.)

On April 4, 2001, Dr. Rojas saw Plaintiff for another followup visit, during which he

stated that Plaintiff had been on a regimen of 20 mg of OxyContin and 600 mg of Neurontin

three times a day.  (Tr. 186.)  Plaintiff's opioid medicine had been increased, but caused

drowsiness.  (Id.)  While Plaintiff had a history of gastrointestinal problems and alcoholism, the

prescriptions were necessary for him to function stably and were renewed.  (Id.)  Dr. Rojas noted

that past trauma left one of Plaintiff's extremities shorter, causing a pelvic tilt that "has

contributed significantly to his pain."  (Tr. 187.)  After determining that the trigger points of

Plaintiff's pain were two areas to the right of his spine, Dr. Rojas gave Plaintiff another trigger

point injection of bupivacaine and triamcinolone.  (Id.)

       On June 21, 2001, Plaintiff returned to Holy Name for a followup.  (Tr. 185.)  During her

examination, Dr. Nestampower determined that Plaintiff had been doing very well until he ran

out of medication and was forced to go to the emergency room, where he was administered a shot

of pain medicine.  (Id.)  Dr. Nestampower advised Plaintiff to continue to wear his lumbar

support and to avoid performing heavy lifting duties.  Dr. Nestampower also noted that Plaintiff

was switching jobs, but remaining in construction.  (Id.)

               **3.**      ***Dr. Fogari***

       Plaintiff saw Dr. Fogari for pain treatment between February 26, 2002, and March 6,

2002.  (Tr. 217-220.)  During this time, Dr. Fogari diagnosed Plaintiff with degenerative joint

disorder and fibromyalgia, and recommended that he be treated with Trazodone and Motrin.  (Tr.

218.)  Dr. Fogari's records indicate that Plaintiff also suffered from arteriosclerotic heart disease,

muscle spasms, disc herniation, disc bulge, and gastritis.  (Id.)

       Dr. Fogari continued to treat Plaintiff from May 30, 2002, through March 24, 2003.  (Tr.

235-249.)

### 4.      *State Agency Doctor's Review of Plaintiff's Medical Records*

On February 25, 2002, Dr. Burton Gillette, a state agency physician, reviewed Plaintiff's medical records and completed a Physical Residual Functional Capacity Assessment.  (Tr. 208.) Dr. Gillette concluded that Plaintiff could occasionally lift and/or carry 20 pounds, frequently lift and/or carry 10 pounds, stand and/or walk (with normal breaks) for a total of six hours in an eight hour workday, sit (with normal breaks) for a total of about six hours in an eight hour workday, and push and/or pull an unlimited amount of weight.  (Tr. 209.)  He stated that Plaintiff can frequently climb ramps, stairs, ladders, ropes, or scaffolds, and occasionally stoop, kneel, crouch, and crawl (Tr. 210), but should avoid concentrated exposure to hazards such as machinery and heights.  (Tr. 212.)  Dr. Gillette concluded that in his "judgment," Plaintiff's pain was attributable to chronic pain syndrome and osteoarthritis; the severity of Plaintiff's symptoms is somewhat proportional to what is expected on the basis of Plaintiff's medically determinable impairments; and the severity of Plaintiff's symptoms and their effect on his functionality is partially consistent with the medical and non-medical evidence in the record.  (Tr. 213.)

On June 4, 2002, state agency physician, Dr. Binder completed a Physical Residual Functional Capacity Assessment.  (Tr. 221.)  Dr. Binder concluded that Plaintiff could occasionally lift and/or carry 20 pounds, frequently lift and/or carry 10 pounds, stand and/or walk (with normal breaks) for a total of at least four hours in an eight hour workday, sit (with normal breaks) for a total of about six hours in an eight hour workday, and push and/or pull an unlimited amount.  (Tr. 222.)  He noted that Plaintiff could occasionally climb ramps and stairs, but never ladders, ropes, or scaffolds.  (Tr. 223.)  Dr. Binder stated that Plaintiff could occasionally balance, stoop, kneel, crouch, and crawl, but that Plaintiff should avoid even moderate exposure

11

to hazards such as machinery and heights.  (Tr. 223, 225.)  Dr. Binder noted that Plaintiff's

allegations were substantiated to a great degree, and in his judgment Plaintiff's symptoms "limit

[his] functionality."  (Tr. 226.)

On June 4, 2002, Dr. Herman Huber noted that Plaintiff did not have a history of

psychological problems, was not in treatment for his alleged depression, and was not impaired in

his daily life activities by any psychological problems. (Tr. 230.)   Dr. Huber concluded that

Plaintiff did not have a severe psychological impairment.  (Id.)

On April 22, 2003, Dr. Marvin Chirls, an orthopedic surgery specialist, testified as a

medical expert in Plaintiff's hearing before the ALJ.  (Tr. 36.)  Dr. Chirls examined the exhibits

in the record, as well as Plaintiff's medical history.  (Id.)  Dr. Chirls stated that Plaintiff's x-rays

showed a healed fracture of his femur and pelvis, but contained no evidence of osteoarthritis in

either his femur or his knee.  (Tr. 37.)  The x-ray of Plaintiff's lumbosacral spine in 1997 was

normal, while a MRI of his lumboscaral spine on August 25, 2000, showed a small foraminal

herniation at the L3-4 and bulging disc at L4-5 and L5-1.  (Id.)  Dr. Chirls went on to state that

Plaintiff's physical examination at Holy Name in July 2000 showed a normal lumbosacral spine.

(Id.)  Plaintiff underwent a series of injections in the facet joints and epidurals as well as a

sacroiliac joint injection.  (Id.)  Dr. Chirls stated that Plaintiff's last examination in 2002 was

normal except for decreased sensation in the entire right lower extremity, which "had no

anatomic basis."  (Id.)  Dr. Chirls noted that a diagnosis of arthritis can only be made through x-

rays.  (Tr. 41.)  As Plaintiff did not have x-rays taken that indicated arthritis nor x-rays that

showed a bulging disc of a size proportional to his alleged pain, Dr. Chirls concluded that there

was no objective evidence to substantiate Plaintiff's claims that his pain was due to either

osteoarthritis or a bulging disc.  (Tr. 38.)  Dr. Chirls stated that the other doctors that treated

Plaintiff for pain were doing so without an objective basis.  (Tr. 47-51.)

## IV. <u>DISCUSSION</u>

### A.    <u>Standard of Review</u>

This Court has jurisdiction to review the Commissioner's decision under 42 U.S.C.

§ 405(g).  This Court must affirm the Commissioner's decision if it is "supported by substantial

evidence."  42 U.S.C. §§ 405(g), 1383(c)(3); <u>Stunkard v. Sec'y of Health and Human Services</u>,

841 F.2d 57, 59 (3d Cir. 1988); <u>Doak v. Heckler</u>, 790 F.2d 26, 28 (3d Cir. 1986).  Substantial

evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a

conclusion."  <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971) (quoting <u>Consolidated Edison Co.</u>

<u>v. NLRB</u>, 305 U.S. 197, 229 (1938)).  Substantial evidence "is more than a mere scintilla of

evidence but may be less than a preponderance." <u>Brown v. Bowen</u>, 845 F.2d 1211, 1213 (3d Cir.

1988) (citing <u>Stunkard</u>, 841 F.2d at 59).  The reviewing court must consider the totality of the

evidence and then determine whether there is substantial evidence to support the Commissioner's

decision.  <u>See</u> <u>Taybron v. Harris</u>, 667 F.2d 412, 413 (3d Cir. 1981).  Furthermore, the reviewing

court is not "empowered to weigh the evidence or substitute its conclusions for those of the fact-

finder."  <u>Williams v. Sullivan</u>, 970 F.2d 1178, 1182 (3d Cir. 1992), cert. denied sub nom.

<u>Williams v. Shalala</u>, 507 U.S. 924 (1993) (citing <u>Early v. Heckler</u>, 743 F.2d 1002, 1007 (3d Cir.

1984)).

In determining whether there is substantial evidence to support the Commissioner's

decision, the reviewing court must consider: "(1) the objective medical facts; (2) the diagnoses

and expert opinions of treating and examining physicians on subsidiary questions of fact; (3)

13

subjective evidence of pain testified to by the claimant and corroborated by family and neighbors;

and (4) the claimant's educational background, work history and present age." Blalock v.

Richardson, 483 F.2d 773, 776 (4th Cir. 1973); Curtin v. Harris, 508 F. Supp. 791, 793 (D.N.J.

1981). Where there is substantial evidence to support the Commissioner's decision, it is of no

consequence that the record contains evidence that may also support a different conclusion.

Blalock, 483 F.2d at 775.

**B.    Statutory Standards**

The claimant bears the initial burden of establishing his or her disability.  42 U.S.C.

§ 423(d)(5).  To qualify for DIB or SSI benefits, a claimant must first establish that he is needy

and aged, blind, or "disabled."  42 U.S.C. § 1381.  A claimant is deemed "disabled" under the

Act if he is unable to "engage in substantial gainful activity by reason of any medically

determinable physical or mental impairment which can be expected to result in death or which

has lasted or can be expected to last for a continuous period of not less than 12 months."  42

U.S.C. § 423(d)(1)(A); see also Kangas v. Bowen, 823 F.2d 775, 777 (3d Cir. 1987).  Disability

is predicated on whether a claimant's impairment is so severe that he "is not only unable to do

his previous work but cannot, considering his age, education, and work experience, engage in any

other kind of substantial gainful work which exists in the national economy."  42 U.S.C. §

423(d)(2)(A); see also Nance v. Barnhart, 194 F. Supp.2d 302, 316 (D. Del. 2002).  Finally,

while subjective complaints of pain are considered, alone, they are not enough to establish

disability.  42 U.S.C. § 423(d)(5)(A).  An impairment only qualifies as a disability if it "results

from anatomical, physiological or psychological abnormalities which are demonstrable by

medically acceptable clinical and laboratory diagnostic techniques."  42 U.S.C. § 423(d)(3).

14

C.     **The Five-Step Evaluation Process And The Burden of Proof**

Determinations of disability are made by the Commissioner, pursuant to the five-step process outlined in 20 C.F.R. § 404.1520.  At the first step of the review, the Commissioner must determine whether the claimant is currently engaged in substantial gainful activity.[3]  20 C.F.R. § 404.1520(b).  If a claimant is found to be engaged in such activity, the claimant is not "disabled," and the disability claim will be denied.  Id.; Bowen v. Yuckert, 482 U.S. 137, 141 (1987).

At step two, the Commissioner must determine whether the claimant is suffering from a severe impairment.  20 C.F.R. §§ 404.1520(a)(ii), (c).  An impairment is severe if it "significantly limits [a claimant's] physical or mental ability to do basic work activities."  Id.  In determining whether the claimant has a severe impairment, the age, education, and work experience of the claimant will not be considered.  Id.  If the claimant is found to have a severe impairment, the Commissioner addresses step three of the process.

At step three, the Commissioner compares the medical evidence of the claimant's impairment(s) with the impairments presumed severe enough to preclude any gainful work, listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.  See 20 C.F.R. § 404.1594(f)(2).  If the claimant's impairment(s) meets or equals one of the listed impairments, he will be found disabled under the Social Security Act.  If the claimant does not suffer from a listed impairment or its equivalent, the analysis proceeds to steps four and five.

In Burnett v. Comm'r of Soc. Sec., 220 F.3d 112, 119-20, 120 n.2 (3d Cir. 2000), the Third Circuit Court of Appeals found that to deny a claim at step three, the ALJ must specify

---

[3] Substantial gainful activity is "work that involves doing significant and productive physical or mental duties; and is done (or intended) for pay or profit."  20 C.F.R. § 404.1510.

which listings[4] apply and give reasons why those listings are not met or equaled.  In <u>Jones v. Barnhart</u>, 364 F.3d 501, 505 (3d Cir. 2004), however, the court noted that "<u>Burnett</u> does not require the ALJ to use particular language or adhere to a particular format in conducting his analysis.  Rather, the function of <u>Burnett</u> is to ensure that there is sufficient development of the record and explanation of findings to permit meaningful review."  (<u>Id.</u>)  An ALJ satisfies this standard by "clearly evaluating the available medical evidence in the record and then setting forth that evaluation in an opinion, even where the ALJ did not identify or analyze the most relevant listing."  <u>Scatorchia v. Comm'r of Soc. Sec.</u>, 137 Fed. Appx. 468, 471 (3d Cir. 2005).

Step four requires the ALJ to consider whether the claimant retains the residual functional capacity to perform his past relevant work.  20 C.F.R. § 404.1520(e).  If the claimant is able to perform his past relevant work, he will not be found disabled under the Act.  In <u>Burnett</u>, the Third Circuit set forth the analysis at step four:

> In step four, the ALJ must determine whether a claimant's residual functional capacity enables her to perform her past relevant work. This step involves three substeps: (1) the ALJ must make specific findings of fact as to the claimant's residual functional capacity; (2) the ALJ must make findings of the physical and mental demands of the claimant's past relevant work; and (3) the ALJ must compare the residual functional capacity to the past relevant work to determine whether claimant has the level of capability needed to perform the past relevant work.

<u>Burnett</u>, 220 F.3d at120.  If the claimant is unable to resume his past work, and his condition is deemed "severe," yet not listed, the evaluation moves to the final step.

At the fifth step, the burden of production shifts to the Commissioner, who must demonstrate that there are other jobs existing in significant numbers in the national economy

---

[4] Hereinafter "listing" refers to the list of severe impairments as found in 20 C.F.R. Part 404, Subpart P, Appendix 1.

which the claimant can perform, consistent with his medical impairments, age, education, past work experience, and residual functional capacity.  20 C.F.R. § 404.1560(c)(1).  If the ALJ finds a significant number of jobs that the claimant can perform, the claimant will not be found disabled.  Id.

When the claimant has only exertional limitations, the Commissioner may utilize the Medical-Vocational Guidelines found in 20 C.F.R. Part 404, Subpart P, Appendix 2 to meet his burden of establishing the existence of jobs in the national economy.  These guidelines dictate a result of "disabled" or "not disabled" according to combinations of vocational factors, i.e., age, education level, work history, and residual functional capacity.  These guidelines reflect the administrative notice taken of the number of jobs in the national economy that exist for a given combination of vocational factors.  20 C.F.R. Part 404, Subpart P, Appendix 2, Paragraph 200.00(b).  When the vocational factors coincide with all the criteria of a rule, the rule directs a conclusion as to whether an individual is disabled.  20 C.F.R. § 404.1569; Heckler v. Campbell, 461 U.S. 458 (1983).  The claimant, however, may rebut any finding of fact as to a vocational factor.  20 C.F.R. Part 404, Subpart P, Appendix 2, Paragraph 200.00(b).

Additionally, pursuant to 42 U.S.C. § 423(d)(2)(B), the Commissioner, in the five-step process, "must analyze the cumulative effect of the claimant's impairments in determining whether she is capable of performing work and is not disabled."  Plummer v. Apfel, 186 F.3d 422, 428 (3d Cir. 1999).  "The combined impact of the impairments will be considered throughout the disability determination process."  42 U.S.C. § 423(d)(2)(B); 20 C.F.R. § 1523; Parker v. Barnhart, 244 F. Supp.2d 360, 369 (D. Del. 2003).  The burden, however, remains on the Plaintiff to prove that the impairments in combination are severe enough to qualify him for benefits.  See Williams v. Barnhart, 87 Fed. Appx. 240, 243 (3d Cir. 2004) (placing

17

responsibility on the claimant to show how a combination-effects analysis would have resulted in a qualifying disability); see also Marcus v. Barnhart, No. 02-3714, 2003 WL 22016801, at *2 (E.D. Pa. Jun. 10, 2003) (stating that "the burden was on [Plaintiff] to show that the combined effect of her impairments limited one of the basic work abilities").

While Burnett involved a decision in which the ALJ's explanation of his step three determination was so inadequate as to be beyond meaningful judicial review, the Third Circuit Court of Appeals applies its procedural requirements, as well as its interpretation of Jones, to every step of the decision.  See e.g., Rivera v. Comm'r, No. 05-1351, 2006 U.S. App. LEXIS 2372, at *3 (3d Cir. Jan. 31, 2006).  Thus, at every step, "the ALJ's decision must include sufficient evidence and analysis to allow for meaningful judicial review," but need not "adhere to a particular format."  Id.

**D.     ALJ Findings**

The ALJ applied the five-step sequential evaluation and determined that Plaintiff was not disabled within the meaning of the Act.  (Tr. 19.)  He found that Plaintiff satisfied step one of the evaluation process because he has not engaged in any gainful activity since October 1, 2001. (Id.)

In determining step two of the evaluation, the ALJ found that evidence established that Plaintiff has a "severe" impairment "involving a bulging disc in the back and rheumatoid arthritis."  (Id.)

In step three of the evaluation, the ALJ found that Plaintiff did not disclose "medical findings, which meet or equal in severity to the clinical criteria of any impairment listed in Appendix 1, Subpart P to Regulations No. 4."  (Id.)  The ALJ noted that Plaintiff's subjective complaints of pain and limitation precluding work activity were not credible or consistent with

18

Social Security Ruling 96-7p, 20 C.F.R. §§ 404.1529 and 416.929.  The ALJ stated that when evaluating Plaintiff's subjective complaints, he gave careful consideration to:

> (1) the nature, location, onset, duration, frequency, radiation, and intensity of any pain; (2) precipitating and aggravating factors (e.g. movement, activity, environmental conditions); (3) type, dosage, effectiveness, and adverse side-effects of any pain medication; (4) treatment, other than medication, for relief of pain; (5) functional restrictions; and (6) the claimant's daily activities and work record.

(Tr. 19.)  In sum, the ALJ found that Plaintiff's complaints of disabling symptoms could not be reasonably accepted because the medical evidence revealed objective findings that could not produce such subjective complaints.  (Id.)  He noted that the medical expert, Dr. Chirls, found that there was no x-ray evidence of arthritis, although there was evidence of a past leg fracture.

(Id.)  The ALJ also noted that the record reflects Plaintiff's normal orthopedic examinations and lack of neurological deficits, as well as evidence of a small herniation and a bulging disc, which would not result in the discomfort alleged by Plaintiff.  (Id.)  The ALJ found that Plaintiff has sought only a limited range of treatments for his pain and only takes mild muscle relaxants.  This evidence, according to the ALJ, reflects a discrepancy between the overall record and his asserted functional limitations.  (Id.)

When considering the opinions of the state agency physicians, the ALJ acknowledged that the physicians were highly-qualified experts in Social Security disability evaluation.  (Tr. 20.) He did not find their opinions persuasive, however, because the opinions were not adequately explained and were based on minimal findings.  (Id.)  The ALJ noted that the physicians were unable to benefit from evidence submitted after their determinations, and were unable to question or assess Plaintiff's credibility.  (Id.)

In considering step four, the final step in the evaluation, the ALJ found that Plaintiff had previously worked as a concierge for Applied Security, a private investigator, a sales associate, a maintenance and construction worker, a corrections officer, and a computer salesman, all positions at or below the medium exertional level of work.[5]  The ALJ concluded that Plaintiff had the residual functional capacity to perform past relevant work as a security concierge and construction worker.  (Id.)  The ALJ noted that Plaintiff has suffered from a "medically determinable 'severe' impairment," which significantly restricts his capacity to perform work. (Id.)  The ALJ found, however, that the evidence established that Plaintiff has the ability to function adequately and to perform many tasks associated with work, including: lifting and carrying objects weighing up to 50 pounds; frequently lifting and carrying objects weighing up to 25 pounds; standing, walking, and sitting for up to six hours in an eight-hour work day; pushing and pulling arm and leg controls; and the full range of medium work.  (Id.)  The ALJ also noted that during treatment in June 2001, Dr. Nestampower stated that Plaintiff intended to switch jobs within the construction industry and return to work.  (Id.)

### E.    Analysis

Plaintiff contends that the ALJ's decision should be reversed, and that Plaintiff should be awarded DIB and SSI benefits, because the ALJ's decision was not supported by substantial evidence.  (Pl.'s Mem. of L. at 12.)  Plaintiff contends: (1) the ALJ improperly evaluated the medical evidence (Id. at 14-18); (2) the ALJ erred in determining that Plaintiff did not meet any

---

[5] Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds, and also includes the ability to perform the exertional requirements of light and sedentary work.  20 C.F.R. §§ 404.1567(c), 416.967(c).

of the listings[6] (Id. at 18-21); and (3) the ALJ erred as a matter of law in finding that Plaintiff

could perform the full range of medium work (Id. at 21-22).

### 1.   *Evaluation of Plaintiff's Medical Evidence*

Plaintiff claims that the ALJ failed to give proper credence to his complaints of "pain,

weakness, muscle spasms, limitation of motion and function, migraine headaches, and mental

impairments, including, *inter alia*, depression, lack of concentration, anxiety, suicidal ideations,

and insomnia." (Pl.'s Mem. of L. at 14.) Plaintiff also asserts that the ALJ improperly relied on

the "inaccurate and at times highly argumentative testimony of Dr. Chirls" and ignored evidence

in the record indicating the presence of osteoarthritis and a bulging disc. (Id.) Plaintiff also

---

[6] Plaintiff specifically argues that the ALJ failed to consider listings 1.02 and 1.04. (Pl.'s Mem. of L. at 18-21.) Listing 1.02 provides:

> Major dysfunction of a joint(s) (due to any cause): characterized by gross anatomical deformity (e.g., subluxation, contracture, bony or fibrous ankylosis, instability) and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s). With:
> > A. Involvement of one major peripheral weight-bearing joint (i.e., hip, knee, or ankle), resulting in inability to ambulate effectively, as defined in 1.00B2b

Listing 1.04 provides:

> Disorders of the spine (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord. With:
> > A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine).

contends that the ALJ based his findings on speculative inferences from medical reports.  (Id. at 18.)

Contrary to Dr. Chirls' opinion that there is no objective evidence of Plaintiff's pain, Plaintiff's medical records indicate he was treated and evaluated by several physicians for his alleged osteoarthritis and bulging disc pain.  Plaintiff's pain treatment included the prescription of OxyContin, Percocet, Neurontin, Trazodone, Flexeril, and Soma.  (Tr. 31, 205.)  A November 9, 1995, x-ray report by Dr. Amiri indicates that Plaintiff had secondary osteoarthrotic change in his ankle.  (Tr. 178.)  Dr. Butkiewicz also indicated in her January 2002 examination of Plaintiff that he had osteoarthritis in his right ankle, as well as osteoarthritis in his lumbar spine.  (Tr. 204.)  Plaintiff also had abnormal orthopedic examinations by Dr. Mousavi in January 1997, which showed osteochondroma on Plaintiff's right fibula and pelvis as well as mild disc herniation of the L5-S1 disc space.  (Tr. 169-173.)

Other opinions that conflict with Dr. Chirls' include those of Dr. Rojas, who treated Plaintiff from August 5, 2000, to April 4, 2001, and Dr. Fogari, who treated Plaintiff from February 26, 2002, to March 24, 2003.  Both Dr. Rojas and Dr. Fogari diagnosed Plaintiff with osteoarthritis and disc herniation.  (Tr. 194, 200, 218, 235-249.)

Dr. Chirls' opinion was also partly contradicted by the opinions of two other state agency physicians, Dr. Gillette and Dr. Binder.  Dr. Gillette concluded that Plaintiff suffered from chronic pain syndrome and osteoarthritis, and that the severity of his subjective symptoms was somewhat proportional to what would be expected based on his medically determinable impairments.  (Tr. 213.)  Dr. Binder also concluded that Plaintiff's allegations were substantiated to a great degree.  (Tr. 226.)  The ALJ, however, "did not find these opinions persuasive" because "they were not adequately explained and were based on minimal findings."  (Tr. 20.)  He

22

noted that these physicians did not benefit from evidence submitted after their determinations, and were unable to question the claimant or assess his credibility at a hearing.  (Id.)

The ALJ, however did not commit error by failing to adopt the state agency physicians' opinions.  While the ALJ must consider state agency reports as opinion evidence, he retains the authority to make the final judgment of disability.  20 C.F.R. § 416.927(e)(2).

Despite all of the contrary evidence in the record, the ALJ's adoption of Dr. Chirls' opinion that Plaintiff is not disabled was supported by substantial evidence; Dr. Chirls' medical opinion was verified by various medical reports in the record.  Dr. Koniuta's reports from 2001, the period when Plaintiff stopped working, show that Plaintiff had a negative straight leg raise test, no lower extremity motor weakness, sensory deficits, and simple back extension and flexion movement.  (Tr. 192.)  Dr. Koniuta's findings, particularly the negative straight leg raise test, indicate that Plaintiff did not have osteoarthritis.  Even Dr. Rojas, the physician that Plaintiff predominantly relies on, noted that on July 19, 2000, Plaintiff had a good range of motion, 5/5 strength in the lower extremity, very slight diminishment in sensation, and a pelvic tilt.  (Tr. 199.)  Dr. Rojas also noted in February 2001 that Plaintiff showed no motor or neurological deficits, and that Plaintiff had placed orthotics in his shoes to equalize his leg length discrepancy and to alleviate the pain caused by his pelvic tilt.  (Tr. 187.)  Dr. Rojas concluded that Plaintiff could, when taking his medication, work and function well.  (Id.)  Physician comments by Dr. Mousavi, Dr. Sharma, Dr. Tracey, and Dr. Wasserman on x-rays taken of Plaintiff's bilateral knees, lumbar spine, hip, right tibia and fibula, and pelvic bone indicate the existence of old healed fractures and post-surgical changes, but no other abnormalities.  (Tr. 167-177.)

When there is conflicting medical evidence, the opinion of the treating physician is accorded greater weight, if it is supported by substantial evidence.  20 C.F.R. § 404.1527(d)(2);

Plummer, 186 F.3d at 429.  An ALJ may discount conflicting medical evidence, but he may not reject evidence for no reason or for the wrong reason.  Morales v. Apfel, 225 F.3d 310, 317 (3d Cir. 2000).  In Morales, the Third Circuit noted that it was improper for an ALJ to reject the opinion of a treating physician and supplant it with his own observation and speculation, even if it were based upon parts of the record.  Id. at 319-320.

This Court finds that the ALJ's conclusions were not speculative, or based on his own observation.  Although Dr. Chirls was not a treating physician, the ALJ's adoption of his opinion was grounded in substantial evidence.  Dr. Chirls drew his opinion from records of treating physicians, and included many of the opinions of such physicians in his final determination that there was no objective basis for Plaintiff's complaints.  The ALJ discounted conflicting medical evidence, such as state agency physician opinions, because the physicians were not able to consider evidence added to the record after their examinations.  The ALJ also discounted other conflicting physicians because there was no objective evidence, such as x-rays, that confirmed the physicians' opinions.

While "a single piece of evidence is not substantial if the Commissioner failed to resolve a conflict created by countervailing evidence or if it is overwhelmed by other evidence - particularly that offered by a treating physician," Dr. Chirls' testimony is supported by other evidence in the record.  Morales, 225 F.3d at 320.  Dr. Chirls' testimony is also not overwhelmed by evidence offered by some of Plaintiff's other treating physicians, such as Dr. Butkiewicz and Dr. Fogari.  Treating physicians, such as Dr. Rojas and Dr. Nestampower, also concluded that Plaintiff could work and function well.  (Tr. 185, 187.)

In sum, this Court finds that substantial medical evidence in the record supports the ALJ's conclusions.

24

**_2._**       **_Substantial Evidence Supports the ALJ's Finding that Plaintiff Failed to Meet the Listed Impairments_**

Plaintiff contends that the ALJ wrongly evaluated the medical evidence to conclude that he did not meet the listed impairment in Appendix 1.[7]  (Pl.'s Mem. of L. 18.)  Plaintiff argues that the ALJ decided that Plaintiff did not meet the listed impairments without a thorough discussion of the evidence.  He further insists that his impairments meet the criteria of listing 1.02, the listing for major dysfunction of a joint(s), and 1.04, the listing for disorders of the spine. (Id. at 19-20.)  Plaintiff also argues that even if the criteria of listing 1.02 or 1.04 were not met, Plaintiff's combination of conditions would qualify as a disability under the "medical equivalence" component of the listings.[8]  (Id. at 20.)

Under Burnett, the ALJ is required to identify which listings apply and give reasons why those listings are not met.  220 F.3d at 119-20, 120 n.2.  The function of Burnett is to "ensure that there is sufficient development of the record and explanation of findings to permit meaningful review."  Jones, 364 F.3d at 505.  This standard can be satisfied without identifying a specific listing, so long as the ALJ clearly evaluates the relevant medical evidence.  Scatorchia, 137 Fed. Appx. at 471.

---

[7] The ALJ discussed steps two and three of the five-step evaluation together by noting that "the evidence establishes the existence of a 'severe' impairment involving a bulging disc in the back and rheumatoid arthritis, but does not disclose medical findings, which meet or equal in severity the clinical criteria of any impairment listed in Appendix 1, Subpart P to Regulations No. 4."  (Tr. 19.)

[8] Plaintiff contends that the ALJ's decision is incomplete because he failed to consider Plaintiff's past diagnoses of depression, lack of concentration, anxiety, suicidal ideations, and insomnia.  (Pl.'s Mem. of L. 21.)

25

In the instant case, the ALJ comprehensively reviewed Plaintiff's medical history before concluding that Plaintiff did not meet the criteria of any of the listings.  (Tr. 18-19.)  The ALJ specifically reviewed Plaintiff's complaints of lower back pain in his lumbosacral spine and his complaints of arthritis pain.  In doing so, the ALJ considered medical evidence from Plaintiff's treatment at St. Mary Hospital and Holy Name Hospital, as well as Dr. Butkiewicz's report and Dr. Fogari's progress notes.  (Tr. 17-18.)

Although some of these medical reports indicate that Plaintiff suffered from joint disorders, the ALJ's analysis of other evidence pertaining to listing 1.02 indicates that Plaintiff does not have a "major dysfunction of a joint."  The record reflects that Plaintiff was able to walk three blocks.  (Tr. 27.)  Dr. Butkiewicz's report states that Plaintiff was able to ambulate without any assisting devices.  (Tr. 207.)  The inability to ambulate effectively is required to meet the criteria of listing 1.02.[9]  20 C.F.R., Part 404, Subpart P, Appendix 1.  The ALJ's consideration of Dr. Butkiewicz's report therefore indicates that he considered this listing.

Plaintiff's argument that the ALJ did not consider listing 1.04 is also unfounded.  Listing 1.04 requires that Plaintiff have sensory or reflex loss, motor loss, neuroanatomic distribution of pain, and paravertebral myofascial pain. 20 C.F.R., Part 404, Subpart P, Appendix 1.  As Plaintiff's pain involves his lower back, he must also have a positive straight leg raise test.  Id. Plaintiff cites Dr. Rojas' July 2000 report in support of his contention that he suffers from these problems.  (Tr. 199.)  The ALJ indicated that he considered these reports in his opinion by citing Plaintiff's treatment at Holy Name.  (Tr. 18.)  In addition, Dr. Rojas' report shows that Plaintiff

---

[9] The inability to ambulate means an extreme limitation of the ability to walk and generally refers to having insufficient lower extremity functioning to permit independent ambulation without the use of a hand-held assistive device.  20 C.F.R., pt. 404, subpt. P, app. 1 § 100(2)(b)(1).

was suffering only from very mild sensory loss, and does not mention neuroanatomic distribution of pain.  (Id.)  Also, various medical reports have produced conflicting straight leg raise results. Dr. Mignola's December 6, 1996 and January 3, 1997 examinations indicate a positive straight leg raise test.  (Tr. 153-154.)  Dr. Garcia examined Plaintiff on March 6, 1997, and also found a positive straight leg raise test.  (Tr. 150.)  More recent medical examinations by Dr. Butkiewicz on January 9, 2002, and Dr. Konuita on January 5, 2001, showed negative straight leg raises. (Tr. 192, 207.)  While the ALJ did not cite the straight leg raise test, the evidence of these conflicting tests was contained in the medical records that the ALJ considered in reaching his conclusion.  The ALJ therefore adequately considered and rejected the application of listing 1.04 to Plaintiff.

Plaintiff also contends that the ALJ failed to consider the combination of his impairments as a disability under the Social Security Act.  (Pl.'s Mem. of Law at 18.)  During the five-step process, the ALJ is obligated to consider all alleged impairments individually and in combination.  42 U.S.C. § 423(d)(2)(B).  Plaintiff, however, continues to bear the burden in establishing how his impairments amount to a qualifying disability.  Burnett, 220 F.3d at 118; Williams, 87 Fed. Appx. at 243.

While the ALJ did not state that he considered Plaintiff's impairments in combination, he concluded, based on an analysis of all his records, that Plaintiff lacked the neurological deficits required for disorders of the spine attributed to a bulging disk, and lacked x-ray evidence to support his contention of osteoarthritis.  (Tr. 19.)  The lack of specific language noting that the impairments were considered in combination does not render the ALJ's decision unsupported by substantial evidence.  See Bryan v. Barnhart, No. 04-191, 2005 U.S. Dist. Lexis 1493, at *4 (E.D. Pa. Feb. 2, 2005) (noting that analyzing and discussing the severity of individual impairments

evidenced a review of the impact of their combination); see also Jones v. Barnhart, 364 F.3d 510, 505 (3d Cir. 2004) (noting that the ALJ is not obligated to employ "magic words" when analyzing the evidence).

The ALJ performed a thorough review of Plaintiff's medical record.  Many of the physicians that treated Plaintiff saw him for a combination of his osteoarthritis and bulging disc pain, not for pain associated with only one of his conditions.  The ALJ considered these reports, such as that of Dr. Nestampower, who had previously seen Plaintiff for pain associated with his bulging disc and osteoarthritis.  (Tr. 185.)  Dr. Nestampower noted that Plaintiff was doing very well on medication and was working.  (Id.)  By pointing specifically to Dr. Nestampower's June 2001 report and to other physicians that treated Plaintiff for his general pain, the ALJ implicitly concluded that the combination of impairments did not result in a qualifying disability.

Plaintiff also argues that the ALJ failed to consider his mental impairments.  (Pl.'s Mem. of Law at 21.)  For an impairment to be severe it must "significantly limit [a claimant's] physical or mental ability to do basic work activities."  20 C.F.R. §§ 404.1520(a)(ii), (c).  The record, however, does not contain sufficient medical evidence warranting a conclusion that Plaintiff's mental impairments were severe, as required by step two of the five-step analysis.  In addition, the record contains a statement from Dr. Huber, in which Dr. Huber concluded that Plaintiff did not appear to have a severe psychological impairment.  (Tr. 230.)  Because the ALJ stated which impairments he concluded were severe, and considered all the medical evidence in the record, including Dr. Huber's statement, this Court is able to conclude that he considered Plaintiff's mental impairments in determining that such impairments were not severe enough to limit Plaintiff's ability to do basic work activities.

28

The ALJ's discussion of the evidence provides a sufficient basis for this Court to perform a meaningful review of his step three finding.  Furthermore, the ALJ's determination that Plaintiff does not meet the criteria of the listings is supported by substantial evidence.

### 3.   *Substantial Evidence Supports the ALJ's Finding that Plaintiff Could Not Perform the Full Range of Medium Work*

Plaintiff contends that the ALJ's determination that Plaintiff can perform medium work should be reversed because "[t]he residual functional capacity is merely conclusory and is not supported by the medical evidence."  (Pl.'s Mem. of L. at 21.)  To support his argument, Plaintiff states that the ALJ relied solely on his own interpretation of the record and ignored the opinions of state agency physicians, who concluded that Plaintiff was limited to light work.  (Id.)  Plaintiff argues that the ALJ must support his residual functional capacity finding with the medical opinion of some examining physician.  (Id.)

In reaching his conclusions, the ALJ stated that although Plaintiff suffers from a "severe" impairment and has a restricted capacity to perform work, "he has had, at all material times, the residual functional capacity to perform work that involves lifting and carrying objects weighing up to 50 pounds; frequently lifting and carrying objects weighing up to 25 pounds; standing, walking, and sitting up to six hours in an eight-hour day; pushing and pulling arm and leg controls; and the full range of medium work."  (Tr. 20.)

State agency physician Dr. Gillette found that Plaintiff could occasionally lift and/or carry 20 pounds, frequently lift and/or carry 10 pounds, stand and/or walk (with normal breaks) for a total of six hours in an eight hour workday, sit (with normal breaks) for a total of about six hours in an eight hour workday, and push and/or pull an unlimited amount of weight.  (Tr. 209.)  To support his conclusions, Dr. Gillette stated that Plaintiff was limited to this activity because he

suffered from chronic pain in the back, hip, and ankle and had a history of pelvic, tibia and fibula fractures, disc herniation, and leg length discrepancy.  (Id.)

Dr. Binder, the other state agency physician, found that Plaintiff could occasionally lift and/or carry 20 pounds, frequently lift and/or carry 10 pounds, stand and/or walk (with normal breaks) for a total of at least four hours in an eight hour workday, sit (with normal breaks) for a total of about six hours in an eight hour workday, and push and/or pull an unlimited amount.  (Tr. 222.)  To support his conclusions, Dr. Binder cited data from the Holy Name and from Dr. Butkiewicz, which showed that Plaintiff had a leg length discrepancy and significantly decreased range of motion in his joints.  (Id.)

The opinions of state agency physicians may constitute substantial evidence if supported by other evidence in the record.  20 C.F.R. §§ 404.1527(f) and 416.92(f).  The ALJ, however, retains the final responsibility for determining Plaintiff's residual functional capacity.  20 C.F.R. § 416.946(c).  While the ALJ did not point specifically to particular medical evidence, the record substantiates his residual capacity finding.  In particular, Plaintiff stated in his testimony that he was capable of walking up to three blocks without assistance.  (Tr. 27.)  Medical evidence also indicates that Plaintiff maintained a 4/5 rating in muscle strength, with some weakness in his bilateral knees and hips.  (Tr. 207.)  Examining physicians also prescribed exercise as a treatment for Plaintiff's pain.  (Tr. 163.)

This Court further notes that Plaintiff was laid off from his job in March 2001, and did not quit due to pain.  (Tr. 97.)  He currently is unemployed, but continues to do simple household chores such as cooking and grocery shopping.  (Tr. 117.)  Plaintiff also is capable of attending Alcoholics Anonymous meetings 10 or 12 times a week.  (Tr. 30.)  The ALJ noted that Plaintiff's

physician was aware in June 2001 that Plaintiff intended to return to work in the construction field.  (Id.)

The ALJ relied on this substantial evidence to conclude that Plaintiff was capable of performing medium level work and was able to return to his job as a security concierge and construction worker.  (Tr. 19.)  The ALJ's conclusion that Plaintiff was not disabled, as defined by the Social Security Act, because Plaintiff retained the residual functional capacity to perform his past relevant work is therefore affirmed.[10]

## IV.  CONCLUSION

For the reasons stated above, this Court finds that the Commissioner's decision is supported by substantial evidence and is affirmed.

Dated: November 21, 2006

                                                         S/Joseph A. Greenaway, Jr.
                                                         JOSEPH A. GREENAWAY, JR., U.S.D.J.

---

[10] It was not necessary for the ALJ to proceed to step five of the sequential analysis to determine whether there are other jobs existing in the national economy that would be suitable for a person in Plaintiff's condition.

31